**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **TYLER HARRIS** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | **JURY TRIAL** |
| | § | |
| **GALVESTON COUNTY TEXAS** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF'S ORGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE U.S. DISTRICT JUDGE:

TYLER HARRIS, Plaintiff, files this Original Complaint and Jury Demand against GALVESTON COUNTY TEXAS (hereinafter "the County"), Defendant, and for cause of action alleges the following:

**INTRODUCTION**

1. Plaintiff Tyler Harris is a resident of Dickinson, Texas who is suing to vindicate the violation of his rights protected by the Fourth and Fourteenth Amendments to the Constitution of the  United States.

2. August 26, 2022, as Tyler was driving to his home, he was stopped by Galveston County Sheriff's Deputy Jordan Buckley on Highway 646. Buckley had no probable cause or other constitutionally permissible basis to make the traffic stop.

3. After Tyler was stopped, Buckley unconstitutionally extended the stop for the purpose of trying to find a pretext to arrest Tyler for something.

1

4.  Lab results confirm that Tyler had not drank alcohol or used any drugs or committed any crime.

5.  Buckley, in further violation of the Constitution and acting under the color of law unlawfully extended his unlawful initial  stop. Buckley unlawfully began to interrogate Tyler without Miranda warnings, unlawfully ordered Tyler out of his truck, unlawfully, and, far too intimately, frisked Tyler for weapons that  Buckley should have reasonably known Tyler could not have concealed in gym shorts and a tee shirt, unlawfully exposed Tyler to public ridicule and humiliation by conducting an improper "field sobriety test," unlawfully searched Tyler's truck, unlawfully impounded Tyler's truck, unlawfully handcuffed Tyler, unlawfully arrested Tyler, unlawfully drove Tyler around for miles handcuffed in the back of a GCSO vehicle fruitlessly seeking to justify his groundless and unconstitutional actions, unlawfully made false statements in official reports with the assistance of the Marc Healy, his GCSO supervisor, that resulted in an unlawful jailing and prosecution of Tyler for DWI, a bogus charge was that was dismissed on the motion Galveston County prosecutors as lacking sufficient evidence.

6. This series of unlawful acts by Buckley and his supervisor  violated well established law voiding any qualified immunity defense they may invoke.

7. GCSO's inadequate training and supervision of Buckley and Healy was a moving force in the  multiple violations of Tyler's rights protected by the Fourth and Fourteenth Amendments to the Constitution of the United States.

8. Any trained and supervised reasonable law enforcement officer in Buckley and Healy shoes would have known that all his actions were unlawful and would not have subjected Tyler to such misconduct.

**THE PARTIES**

9. Plaintiff Tyler Harris is a resident of Dickinson, Texas.

10. Defendant Jordan Buckley is a GCSO deputy and is sued in his individual and official capacity. Summons can be served on Buckley at the Galveston County Sheriff's Office, 601 54th Street, Galveston, Texas, 77591, or wherever he may be found.

11.  Defendant Marc M. Healy, Buckley's supervisor, is a GCSO deputy and is sued in his individual and official capacity. Summons can be served on Healy at the Galveston County Sheriff's Office, 601 54th Street, Galveston, Texas, 77591,  or wherever he may be found.

12. Galveston County is a Texas political subdivision operating under Texas's Constitution and law. Summons can be served on Galveston County by serving Galveston County Judge Mark Henry at 722 Moody, Suite 200, Galveston, Texas 77591, or wherever he may be found.

**JURISDICTION AND VENUE**

13.  Tyler brings this lawsuit under the Fourth and Fourteenth Amendments to the Constitution of the United States of America, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 2201.

14.  This Court has jurisdiction under 28 U.S.C. § 1331 because Tyler brings claims under the Constitution of the United States and federal laws. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) because Tyler seeks to redress the deprivation of federal constitutional rights under the color of state law or custom.

15.  Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) as the events giving rise to Plaintiff's claim occurred in this district.

**FACTUAL ALLEGATIONS**

**Buckley had no basis to stop Tyler.**

16. August 26, 2022, Buckley stopped the truck driven by Tyler Harris. Buckley had no lawful basis for the stop. Buckley's only articulated pretext for initiating the stop, prior to the stop, was an alleged light malfunction on the truck itself.

17. When stopped by Buckley, Tyler was driving his father's truck to his home from a visit with his girlfriend.

18. Tyler was an 18-year-old black man with no criminal history.

19. During the drive, Tyler violated no traffic laws. He was properly observant to the roadway and his surroundings. He properly controlled his speed and the direction of his truck. He saw and complied with all traffic signals and signage, including the posted speed limit.

20. When stopped by Buckley, Tyler was not impaired. He did not drink alcohol. He did not use illegal drugs. All lab reports confirm the absence of any alcohol, marijuana or any other intoxicants.

21. The events described in this Complaint are consistent with GCSO body-worn cameras or the dash cameras.

22. Without reasonable or lawful basis, Buckley began to follow Tyler, and without reasonable or lawful basis, Buckley initiated a traffic stop of Tyler's truck.

23. When Tyler first saw Buckley's emergency lights in his mirror, he assumed the law enforcement vehicle was on business not related to him. He slowed and steered his truck slightly to the right to allow the law enforcement vehicle adequate room to pass.

24. When Tyler heard a short tweak of the law enforcement vehicle's siren, he further slowed his truck, looking for a well-lit spot on his right to pull over. He turned into the first well-lit area, and brought his truck to a stop, lowered his driver-side window, and made sure his hands were clearly visible on the steering wheel.

25. When Buckley reached the truck window, he began to interrogate Tyler about why he did not stop sooner. This interrogation, without Miranda warnings, occurred in face of the fact that Tyler, as any reasonable law enforcement officer should know, stopped his truck at the first safe place available to him, and did nothing to indict that he was evading or fleeing.

26.  Tyler, who was unnerved by a law enforcement officer stopping him for no known reason, explained that, while he thought the emergency lights must be directed at something or someone else, and he did immediately slow down, and stopped at the first well-lit area available.

27. Buckley argued that Tyler had passed a lit-up area. Tyler guessed Buckley was referring to an area on the left-hand side of road a short distance from where Tyler did stop.

28. Tyler felt Buckley's comment was strange. Stopping where Buckley suggested would have required a left turn across traffic and would have impeded the progress of Buckley's vehicle if, as Tyler had assumed, the emergency lights were not intended for him. The right shoulder was neither well-lit nor a reasonable place for anyone to stop.

29. Tyler, however, not wanting to argue with the deputy, kept that his quite reasonable thinking to himself.

30. Buckley and a bystander officer carried on for a while as if they had reason to believe, which they did not, that Tyler was a flight risk. Video footage from Buckley's dashcam that is in the possession of the GCSO confirms that Buckley could not have reasonably suspected that Tyler was fleeing, and Tyler did pull in and stop at the first reasonably appropriate place on the right side of the road. Moreover, Buckley never engaged his siren continuously as if he were in pursuit. Instead, as Tyler approached the area where he did stop, Buckley tweaked his siren. Tyler pulled in and stopped.

31. Buckley did not tell Tyler why he chose to stop him or why he was interrogating him.

32. When asked for his driver's license and proof of insurance, Tyler complied.

**Buckley unconstitutionally extended the traffic stop.**

33. Nothing in Tyler's responses to Buckley or in his demeanor would have given Buckley—or any reasonable officer in Buckley's shoes—a reason to suspect Tyler of any crime or to extend and escalate the traffic stop as Buckley did.

34. Buckley continued to interrogate Tyler after Tyler had given Buckley his driver's license and other documentation he asked for. Buckley asked Tyler all manner of personal questions without any reasonable basis for doing so. Tyler, though increasingly fearful, provided calm, truthful, and benign answers.

35. Despite Tyler's honest and innocuous answers, Buckley ordered Tyler out of the vehicle.

36. Buckley never asked Tyler for consent to search his truck.

37. Buckley's conduct and statements indicate his role was not to enforce traffic laws but was to use traffic stops as a tool to investigate drivers and search their cars for other crimes without a constitutionally justified right to do so.

38. Tyler's responses to Buckley's interrogation were polite and understandable. Nothing about Tyler would have suggested Tyler's involvement in criminal activity to a professionally trained and supervised reasonable law enforcement officer.

39. Tyler's responses were consistent with his truthful and reasonable explanation for his travel.

40. Buckley continued to interrogate Tyler at significant length for no reason apparent to Tyler.

41. Tyler felt threatened by the nature and length of Buckley's interrogation and feared Buckley's motives and intentions. Tyler, however, did his best to remain calm and compliant despite Buckley's increasingly personal questioning.

**Buckley had no lawful justification for ordering Tyler out of his truck.**

42. Buckley without reasonable cause or explanation ordered Tyler to get out of his truck. Though unsure of his rights and why this was happening, Tyler complied.

43. Buckley saw Tyler get out of the truck and had to have appreciated that he posed no threat to the heavily armed Buckley and the other equally heavily armed law enforcement officers present.

44. Tyler was young, nervous, and wore only a tee shirt, gym shorts, white socks and slip-on sandals. He wore glasses to drive.

45. Tyler's appearance, conduct, and demeanor were non-threatening and compliant.  Yet, unreasonably, Buckley asked Tyler if he had any weapons on him.

46. Tyler was increasingly disturbed and frightened by Buckley's obvious escalation of the still unexplained traffic stop, and Tyler tried to lighten the escalation by gesturing to his clothes, pointing out the obvious—he had no place, given his attire, to conceal a weapon.

47. Buckley, apparently taking Tyler's gesture as somehow disrespectful, continued to escalate, demanding that Tyler respond directly to his continued unlawful interrogation.

48. Buckley demanded Tyler answer his question about weapons. Tyler complied. He, of course, had no weapons concealed on him.

48. Not satisfied, Buckley escalated by patronizing and publicly humiliating Tyler. He made Tyler place his hands on Buckley's patrol vehicle and proceeded to rub his hands all over Tyler's body. This unnecessarily intimate and public touching embarrassed and disturbed Tyler,

but he kept his thoughts to himself, trying to endure wherever Buckley was going with the traffic stop.

49. Buckley's "frisk," as Buckley knew or should have known, yielded no weapons, and served only as tool of control, degradation, humiliation, and threat. Tyler, had no weapons, but Buckley and at least two other bystander officers who were heavily armed. Buckley had no reason to fear Tyler. Tyler had every reason to fear Buckley and did.

50. After rubbing Tyler's body, Buckley, without explanation, had Tyler turn around to face him, and began to shine a flashlight light into Tyler's eyes.

51. Next Buckley had Tyler walk heal to toe heal on an "imaginary line."

52. In his socks. Tyler did just as Buckley requested.

53. When Tyler walked the imaginary line in compliance with Buckley's commands, Tyler asked Buckley how he wanted him to execute the turn to walk back on the "imaginary line."

54. Buckley, again without reason, assertively told Tyler that he did not plan to give any more "hints." Even absent the distress Tyler was experiencing, Buckley's "instructions" and "demonstration" were far from clear. If Buckley's purpose were to conduct a field sobriety test, his conduct was thoroughly unprofessional, and, while Buckley seemed to enjoy his lawless exercise of control, it served no legitimate law enforcement goal or purpose. It did serve the purpose of further intimidating and humiliating a young black man with no history at all of criminal behavior.  Regardless, Tyler complied.

55. Buckley, then, told Tyler to raise one of legs for 40 seconds. Tyler complied and held one raised leg for the time demanded by Buckley. Tyler, who lab testing would confirm was stone-cold sober, held the position as instructed and better than most persons under the stressful circumstances could have done.

**Buckley arrested Tyler without probable cause.**

56. Despite this, Buckley turned Tyler around, pulled Tyler's hands behind his back, handcuffed Tyler, and told him he was under arrest.

57. Buckley's particular application and interpretation of a field sobriety test would permit him to arrest ANYONE.  Tyler's performance of the tasks requested by Buckley would not have objectively justified a suspicion of intoxication to any professionally trained and supervised law enforcement officer. If Tyler's performance suggested intoxication, the same would be true of essentially everyone performance of the same tasks even when, like Tyler, they were objectively not intoxicated.

**Tyler's truck was unconstitutionally searched.**

58. Buckley instructed Tyler to sit handcuffed in Buckley's vehicle and rummaged around in the disorganized back of the unit, looking for something.

59. Another Galveston County Sheriff deputy began, without constitutional justification, searching Tyler's truck. Buckley joined in the search. The unconstitutional search yielded nothing.

60. During his unlawful search of Tyler's vehicle, Buckley made a phone call. After beginning the call by saying, "I have a dumb question . . .," Buckley muted the audio on his bodycam. On information and belief, Buckley was speaking to a supervisor and worked with that supervisor to plan an attempted justification for the arrest he had already made.

61. After speaking on the phone for some time on the phone and also having Tyler's truck towed, Buckley got into his unit, with Tyler handcuffed in the back, and began a lengthy drive to different locations in the obvious attempt to find something to support his acts of misconduct that are set out in this Complaint.

**GSCO False and Misleading Reporting**

62. Facts set out in this complaint evidence that the GCSO "reasons" for Buckley's traffic stop, and arrest of Tyler were based on false and misleading reporting by Buckley that was approved by Healy, his supervisor.

63. Buckley's written narratives all begin with Buckley *getting the date of the traffic stop wrong,* and his supervisor *ignoring this red flag* and approving this error.

64. GCSO's radio logs report that Buckley first radioed the dispatcher August 26, 2022, 11:35:27 PM.

65. However, Buckley's Probable Cause Narrative within the DWI Case Report he prepared, and Healy approved, begins by reporting, incorrectly, that events began August 27, 2022.

66. Buckley repeats the same error in his Reporting Officer Narrative and in a Probable Cause Affidavit. Healy, again, *approved these red flags.*

67. The events did not begin August 27, 2022, and a cursory look at existing GCSO information should have made this clear to both Buckley and Healy.

68. GCSO radio log, which confirms that Buckley first radioed the dispatcher August 26, 2022, 11:35:27, also confirms that Buckley ran the plates on Tyler's truck  August 26, 2022, at 11:35.31 PM.

69. Buckley actually had to run the plates twice, because he got it wrong on his first attempt. This *red flag* was not reported by Buckley or Healy despite its obvious relevance to Buckley's observational abilities that were relied upon so heavily by the GCSO in its pursuit of criminal charges against Tyler.

70. The same radio log confirms that Tyler had been arrested, his truck towed, and Buckley had been requested to make a report by August 26, 2022, 11:55: 01 PM.

10

71. Despite all this, in documents used by GCSO to violate Tyler's protected liberty and assault his reputation, Buckley, who even had difficultly running the correct license plate of Tyler's truck, repeatedly began his reports using *the wrong day,* and his supervisor *approved* the repeated error. This is not mere sloppiness. It represents a willful indifference to the accuracy and reliability of the GCSO investigation and reporting that was intended to have and did have grave consequences for Tyler Harris.

72. When Buckley ran the correct plate number, it yielded no basis for suspicion of a crime or justification for a traffic stop. This fact was omitted from all GCSO reporting, and the omission approved by Healy'

73. Further doubt is cast on the credibility and truth of GCSO reporting by this significant "conclusion" in the DWI Case Report:

> Based on the totality of the circumstances, the Defendant lost the normal use of ***their*** mental and physical faculties, and was intoxicated.

(emphasis added). This plural pronoun "their" evidences Buckley and Healy reporting was not the product of a legitimate investigative effort. Instead, it was a formulaic exercise designed to rationalize a predetermined outcome. This important "conclusion" was obviously cut and paste exercise in which the GCSO did not care whether the "conclusion" was directed at one person or more than one person.

74. Compounding the abundant *red flags* in thee GCSO reporting used to justify the traffic stop, the extension of the traffic stop, and Tyler's arrest and prosecution, DWI Case Report was not signed by Buckley, the line for Buckley's absent signature is dated September 4, 2022. Yet, it was **approved** by Marc M. Healy, Buckley's supervisor, August 30, 2022.

75. Accordingly, the facts evidence that Buckley's highly relevant DWI Case Report was *approved* by his supervisor Healy days before Buckley ostensibly wrote it.

76. Buckley's Probable Cause Narrative within the DWI Case Report falsely claims that, while he was following Tyler on FM 646, he saw Tyler's truck "cross the middle lane divider and fog line multiple times." This accusation is false. Tyler properly maintained his lanes and did nothing like the swerving about the GCSO intentionally and knowingly exaggerated to the point of not being truthful. The exaggerated, false, and misleading GCSO reporting could have been and should have been easily verified by Buckley's dash cam video that was and is GSCO's possession.

74. Buckley's Probable Cause Narrative within the DWI Case Report and Buckley's Reporting Officer Narrative heavily relies on Buckley's subjective "observations." Those highly prejudicial observations include describing Tyler as "dirty." Tyler's clothes are described as "disorderly," Tyler's eyes are described as "watery, glassy, bloodshot." Tyler is described as "spaced-out." These descriptors are not only subjective, but evidence an animus toward Tyler—a predisposition, a profiling, a bias. All raise fact issues about Buckley's observational reliability and support a race-based pre-judgment that infected Buckley's observations.

75. Buckley's bias and pre-judgement is underlined by his repeated omissions of Tyler's responses to Buckley's questioning. The facts pled in this complaint support the claim based on information and belief that Buckley's actions were the result of racial discrimination. If the "evidence" used by Buckley and his supervisor justified a traffic Tyler's traffic stop, the extension of the stop, and Tyler's arrest and prosecution for DWI, ANYONE and EVERYONE who uses public roadways in  Galveston County is vulnerable to the same mistreatment. The selective targeting of a young black male by Buckley for this misconduct supports the well-known danger of "driving while Black," and supports Tyler's right to full discovery on the claim of racial discrimination.

76. Buckley falsely denied that he asked Tyler any questions as the rationale for his failure to give Tyler the Miranda warning before interrogating him. This falsehood--that Buckley asked no questions—is demonstrably untrue from the dashcam and bodycam footage in GCSO possession. Moreover, the bystander deputies who heard Buckley's questioning, if they spoke truthfully would also confirm Buckley's false statement that he asked no questions of Tyler. Yet, Buckley's supervisor *approved* this falsehood.

77. Tyler, for example, was interrogated by Buckley about Buckley's accusation that Tyler's eyes. in Buckley's opinion, looked suspicious. Tyler let Buckley know that he had spent much of the evening playing an electronic game that can strain the eyes.

78. The GCSO has body camera and dash camera videos in its possession that objectively conflict with Buckley's "observations" about Tyler's bearing and appearance.

79. Buckley's Probable Cause Narrative within the DWI Case Report and Buckley's Reporting Officer Narrative reports that Buckley, " Observed ashes on the floorboard and the ashtray of the vehicle" and " numerous boxes and matches in the passenger door  of the vehicle." His reporting omits that none of these ashes were from marijuana or any other intoxicant. Instead, as Tyler responded to Buckley's interrogation, they were ashes from his father's cigar smoking. This too was omitted from all of Buckley's reporting.

80. Buckley's Probable Cause Narrative within the DWI Case Report and Buckley's Reporting Officer Narrative falsely claim that Buckley "could smell the odor of marijuana emitting from the vehicle." No other deputy corroborates Buckley's claim. No evidence supports that anyone used marijuana in the truck. Lab results from the Texas DPS and Care Now confirm that Tyler's blood and urine tested negative for alcohol, marijuana, or any other intoxicants.

81. Further. Buckley told two different and conflicting stories about the supposed marijuana odor in the DWI Case Report. When asked in the "Observation" section of the DWI Case report why he suspected cannabis, Buckley reported: "I smelled a strong odor of marijuana when I made contact with the defendant at the driver door at the vehicle." This conflicts with Buckley's original narrative in which Buckley reported that he smelled marijuana "emitting from the truck." As no evidence of any marijuana use in the truck exists, it raises a fact issue about Buckley's sense of smell and the credibility of his observational reporting. The uncorroborated and conflicting reporting of marijuana by Buckley, that was approved by Healy, reveals another ignored *red flag.*

**Buckley's fishing expeditionary travels throughout Galveston County with Tyler in handcuffs.**

82. August 27, 2022, 12:34:17 AM, as reported by Buckley, he with Tyler, who was handcuffed in the backseat of Buckley's unit, arrived at Memorial Hermann League City. Tyler consented to have his blood tested for intoxicants.

83. August 27, 2022, 12:34 AM, as reported by Memorial Hermann, Tyler's blood was drawn. The Texas Department of Public Safety laboratory analyzed Tyler's blood specimen and reported it as negative for any intoxicants. This was confirmed by Care Now urine and blood testing requested by Tyler immediately after his release from jail on bond.

84. Buckley, next, drove Tyler, who was in handcuffs, to the Santa Fe Police Department, arriving August 27, 2022, 12:45.49 AM, according to GCSO reporting. At that location, GCSO Deputy Rao performed more testing in the GCSO's relentless and fruitless effort to support Buckley's ill-advised and unconstitutional traffic stop, the extension of that stop, the groundless search of Tyler's truck, the baseless and humiliating frisk, the baseless and humiliating "field sobriety test, the arrest, jailing and prosecution of Tyler.

14

85. Much of the testing done at Santa Fe PD simply repeated that which Buckley claimed he properly performed, but the reported "findings" materially differed from those reported by Buckley. This *red flag* was also ignored, not investigated, and the conflicts omitted from Buckley and Healy's reporting.

86. Roa did not find Tyler's "watery."

87. Rao reported Tyler had no resting or vertical nystagmus, and Tyler's eyes followed the stimulus.

88. Rao's report of the "walk and turn" and "leg lifting" test significantly differed from Buckley's. Despite the events Tyler endured after Buckley's stop, Tyler's "performance" on the "field sobriety test" was, when observed by Rao, significantly different and "better" than it was as described by Buckley.

89. Moreover, Rao conducted a breath test that did not support intoxicants. This *red flag* was not heeded, investigated, or discussed in the Buckley and Healy reporting.

90. August 27, 2022, 1:56:23, well after Tyler's arrest, Buckley got around to having Tyler's driver's license run. It too did not support the Buckley and Healy reporting. Tyler's record was clean. It is factually accurate to state that every measure Buckley took following his arrest of Tyler developed facts that diminished the credibility of Buckley's subjective observations.

91. Buckley eventually ended his fishing expedition by driving Tyler, who remained in handcuffs, to the Galveston County Jail, arriving August 27, 2022, 2:17.14 AM, according to GCSO reporting.

92. Immediately following Tyler's booking, in accord with practices well-known to the GCSO, Tyler's arrest for DWI and his "mugshot" were published to the public at large.

93. August 27, 2022, at approximately 6:20 PM, Tyler had Care Now take blood and urine samples from him for analysis. Like the testing done by Galveston County, the results were negative for alcohol, marijuana, or any other intoxicant in Tyler's blood and urine..

94. December 15, 2022, the Galveston County prosecutor moved to dismiss the charge against Tyler.  The same day the dismissal was granted by the presiding judge of Galveston County Court at Law No, 3.

95. At all times Buckley and Healy and the bystander deputies were acting under the color of law as on-duty GCSO deputies and employees and the misconduct factually described in the Complaint was in accordance with GCSO official customs and practices, as approved or ratified by Galveston County's chief law enforcement policy-maker, the Sherriff of Galveston County, and its inadequate training and supervision, as approved or ratified by Galveston County's chief law enforcement policy-maker, the Sherriff of Galveston County.

96. The misconduct described in this Complaint was expressly approved and participated in the arresting officer's supervisor.

97. On information and belief, based on facts set out in this Complaint, traffic stops initiated by GCSO deputies on the pretext of minor traffic violations that result in arrests for more significant crimes, *which  are subsequently dismissed for lack of probable cause or insufficient evidence*, make up such a significant percentage of all GCSO traffic stops that the Defendant, through its chief law enforcement policy-maker, knows traffic stops initiated for minor traffic violations are frequently used by GCSO deputies as a pretext to search for evidence of other more serious crimes for which those deputies have no warrant, no probable cause, no reasonable suspicion, nor any other constitutionally justifiable basis conduct such searches.

98. Defendant intentionally or through deliberate indifference ratifies this misconduct by permitting it to continue and failing to alter its customs or practices or policies or training or supervision or taking any other measures to prevent or even reduce the number of traffic stops that result in arrests for more serious crimes *that are subsequently dismissed for lack of probable cause or insufficient evidence.*

### INJURY TO PLAINTIFF

99. The violations of Tyler constitutional rights as set out in this Complaint caused Tyler injury. Being stopped, interrogated, subjected to humiliating public "tests", handcuffed, arrested, having his vehicle searched, driven to a variety of locations while arrested all in a failed effort to develop evidence of intoxication, falsely charged, and jailed when he had done nothing wrong was an invasive, embarrassing, frustrating, humiliating, and stressful experience for Tyler.

100. Tyler was forced to answer dozens of probing questions about his identity, activities, past injuries, medications, travels, family, living situation, criminal history, activities, and possessions—an invasion of his privacy.

101. After the search, the officers left Tyler's father's truck a mess, and towed it to an impound lot where fees were incurred to regain possession of it.

102. Because Buckley stopped Tyler without a factual basis to believe Tyler had committed a traffic violation, Buckley violated Tyler's right to be free from unreasonable seizures.

103. Regardless of whether there was any factual basis for the stop, Buckley extended the stop without any factual basis for doing so. As a result, a stop that should have only lasted a few minutes continued long after that. This deprived Tyler of his freedom of movement.

104. Despite having no evidence that Tyler had done anything wrong, Buckley arrested Tyler, handcuffed him, held him in the back of Buckley's patrol unit as Buckley drove to a variety

of locations, apparently in a futile search for evidence, further depriving Tyler of freedom of movement.

105. The invasive and unjustified search of Tyler's person via the frisk and via the search of his father's truck and belongings invaded Tyler's privacy and property rights.

106. Because Tyler Father's truck was searched without a warrant, without consent, and without probable cause to believe the truck contained contraband or other evidence of a crime, Tyler's right to be free from unreasonable searches was violated.

107. Because Tyler's constitutional rights were violated, Tyler has lost his sense of security and trust in GCSO, its officers, and law-enforcement officers generally.

108. The violation of Tyler's constitutional rights caused Tyler stress and anxiety and humiliation.

109. Because Tyler was wrongfully arrested, charged with a crime, and jailed, he incurred the cost of bail, and attorney fees for legal representation in the case that was dismissed for lack of evidence/

110. Because Tyler was wrongfully arrested and charged with a crime Defendant publicly posted about his arrest and published his "mugshot," Tyler has suffered permanent damage to his reputation.

111. There is a significant risk that Galveston County and its deputies will again pull over Tyler as he travels through Galveston County when he has done nothing wrong. Tyler remains stressed and anxious that his constitutional rights will be violated again.

### CAUSES OF ACTION

### COUNT ONE – 42 U.S.C. § 1983
### VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS BY GCSO DEPUTIES BUCKLEY AND HEALY

112. Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

113. The Fourth Amendment, as incorporated and applied to the states through the Fourteenth Amendment, protects "[t]he right the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; amend. XIV. It is clearly established that the Fourth Amendment specifically protects the people's right "to be free from police arrest without a good faith showing of probable cause." *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018). The Fourteenth Amendment guarantees all persons equal protection of the law. U. S. Const. amend, XIV.

114. As described in the in this Complaint, Defendants Buckley and Healy while acting individually, as well as under color of law and within the scope of their employment, deprived Tyler of his clearly established constitutional rights, including Tyler's right to be free from police arrest without probable cause under the Fourth and Fourteenth Amendments and equal protection of the law under the Fourteenth amendment.

115. At the time of Plaintiff's arrest, Buckley and Healy knew or should have known that they did not have probable cause to arrest Plaintiff on the charge of driving while intoxicated.

116. In the manner described more fully in this Complaint, Buckley and Healy conducted or approved a reckless criminal investigation and reporting of that investigation that knowingly included obvious fact error, false statements, and material omissions

117. Absent this misconduct, the arrest and subsequent prosecution of Tyler could not and would not have been pursued.

118. Additionally, and as explained more fully in this Complaint, Buckley and Healy, while acting under the color of state law, deprived Tyler of his clearly established rights under the Fourth Amendment, as applied to the states through the Fourteenth Amendment, by:

a. Knowingly preparing documentation to justify their misconduct, including, but not limited to an incident report, a DWI report, and a probable cause affidavit that contained material fact errors. Omissions of material facts, and false statements of material fact; and

b. Presenting this documentation to support the unfounded criminal charges that were subsequently dismissed for lack of evidence.

119. Tyler would not have been charged if this documentation did not include the material errors, omissions, and false statements.

120. The Buckley and Healy misconduct, as described fully herein, directly resulted in the unjust arrest and criminal prosecution of Tyler in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution.

121. Buckley and Healy violated 42 U.S.C. § 1983 by detaining or approving the detention of Tyler Harris in violation of his Fourth Amendment expectation of privacy and guarantee to security from unreasonable search and seizure without reasonable suspicion and/or probable cause and by failing to provide supervision and/or proper training, where it was necessary and/or required by law. Section 1983 was also violated by Buckley and Healy's reliance on "observations" that, having no objective anchoring, could be used to justify the charging anyone with DWI, but were used selectively to target a young black male whose general demeanor, dress, manner of speaking, and sense of sense of humor, while not a basis for a criminal charge, differed from Buckley's and Healy's to the degree that they interpreted the differences as suspicious and based on racial

profiling charged him with a crime, denying Tyler the equal protection of the law guaranteed by the Fourteenth Amendment.

122. The Buckley and Healy misconduct, as described in this Count, was objectively unreasonable in light of the facts and circumstances known to them at the time and was undertaken intentionally or with willful indifference to Tyler's constitutional rights.

123. At the time of the Buckley and Healy misconduct, as described herein, no reasonable officer or investigator with the same information could have believed that his or her actions were lawful in light of clearly established law. Therefore, Buckley and Healy are not entitled to qualified immunity.

124. As a direct and proximate result of the Buckley and Healy misconduct and the violations of Tyler's constitutional rights, Tyler suffered a loss of liberty when he was falsely arrested and held in custody, and suffered and will continue to suffer emotional distress, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

## COUNT TWO– 42 U.S.C. § 1983
## MUNICIPAL LIABILTY
### Deprivation of Constitutional Rights Through Failure to Train and Supervise

125. Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

126. A failure to train or supervise may give rise to municipal liability if the failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."

127. Galveston County knowingly or with deliberate indifference failed to adequately train and supervise the GCSO's patrol deputies and their supervisors in the constitutional requirements and limitations that relate to a traffic stop.

128.   At all times relevant to this action, Galveston County has maintained policies, customs and/or practices that caused and were the moving force behind the violation of Tyler Harris' constitutional rights, as described in this Complaint.

129. In a 1983 claim for failure to supervise or train, the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.

130. For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

131. An official's actual knowledge of a substantial risk may only be inferred if the "substantial risk" was obvious.

132. Galveston County's failure to train and supervise GCSO deputies Buckley and his immediate supervisor Healy caused a violation of Plaintiff's constitutional rights under the Fourteenth and Fourth Amendments.

133. Galveston County's was responsible for training and supervising the actions of GCSO deputies.

134. Had GCSO deputies Buckley and Healy been properly trained and supervised by the Galveston County, Tyler would not have been stopped by Buckley, the stop would not have been extended, Tyler would not have been detained, Tyler's truck would not been searched and towed

away, Tyler would not have been subjected to a humiliating frisk and wrongly conducted and evaluated "field sobriety test," Tyler would not have been driven handcuffed to different locations in Galveston County in a fruitless effort to find non-existent evidence of his guilt, GCSO false reporting would not have been used to have Tyler charged and prosecuted for a crime he did not commit that was  dismissed for the obvious lack evidence to support it, Tyler would not have been jailed, Tyler would not have been required to post bail, and Tyler's "mugshot" would not have published by the Galveston County.

135. A professionally trained and supervised patrol Deputy would not have committed the multiple constitutional violations as Buckley did, and a professionally trained and supervised Supervisory Deputy would have halted, rather than approved and participated in the multiple violations of Tyler's constitutionally protected rights as Healy did.

136. The discrepancies between Buckley's subjective "observations" and the irrefutable fact that no objective evidence supported those "observations" were so apparent and significant at the time Tyler was arrested at the scene of the stop that any reasonably trained and supervised law enforcement officer would not have sought charges against Tyler.

137. In the field, a professionally trained and supervised law enforcement officer would never have driven about Galveston County seeking justification for his imprudent and unconstitutional violation of a young man's rights as Buckley did.

138. That Tyler's lab reports came back absolutely clean merely confirmed that which should have been obvious at the scene of the wrongful stop.

139. That Buckley and Healy were not, at the very least,  retrained by Galveston County and Galveston County's failure to investigate the GCSO's training and supervisory breakdowns

that had severe negative consequences for a young black man with a spotless record is evidence of deliberate indifference to well-established constitutional norms.

140. Viewing any of the many red flags set out in this Complaint should have caused a thorough review of Buckley and Healy "investigation" and persecution of Tyler Harris, and an analysis of how many other citizens, particularly non-white citizens, were stopped by GCSO deputies and charged with crimes that were subsequently dismissed. Galveston County 's failure to take seriously GCSO's serious failings is evidence of its deliberate indifference to whether or not GCSO deputies are adequately trained and supervised to fully understand and abide by required constitutional guardrails.

141. Furthermore, had Buckley and Healy been professionally trained and supervised the obvious mistakes and discrepancies in their reporting would have revealed that probable cause for the arrest did not exist.

142. Thus, Galveston County 's failure to professionally train and supervise Buckley and Healy directly caused and was the moving force in the violation of Tyler's constitutional rights protected by the United States Constitution.

143. The GCSO and its deputies were at all times relevant to action  acting under the color of law.

144. As a direct and proximate result of Galveston County's failure to train and supervise GCSO deputies, Tyler suffered a loss of liberty when he was falsely arrested and held in custody, and suffered and will continue to suffer emotional distress, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

**COUNT THREE– 42 U.S.C. § 1983:**
**MUNICIPAL LIABILITY**
**Constitutional Deprivation of a Citizen's Right to be Free from Wrongful Search and Seizure and a Citizen's Right to Equal Protection as Guaranteed by the Fourth and Fourteenth Amendment through Policy, Custom or Practice**

145. Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

1462. Local governing bodies, or municipalities, may be held liable under 42 U.S.C.§1983 for constitutional deprivations committed pursuant to a policy, custom, or practice of the municipality. Even absent an officially adopted policy, a custom or practice that is so persistent and widespread that it fairly represents a municipal policy will support liability against the municipality. A pattern of unconstitutional conduct may be shown on the part of municipal employees who are not policymakers.

147. Galveston County knowingly or with deliberate indifference failed to maintain policies, practices, and training that met the minimum standards in the industry.

148. At all times relevant to this action, Galveston County has maintained policies, customs and/or practices that caused and were the moving force behind the violation of Tyler Harris' constitutional rights, as described in this Complaint.

149. The acts and/or omissions of Buckley and Healy were caused by said policies, customs or practices.

150. The primary policymaker for Galveston County's sheriff deputies the County Sheriff had actual or constructive knowledge about said policies, customs or practices and/or were deliberately indifferent as to said policies, customs or practices.

151. Said policies, customs and practices include the following:

a. Galveston County's failure to train GCSO deputies on properly handling traffic stops, extensions of traffic stops, the conduct of searches, and constitutionally valid bases for initiating and conducting investigations for criminal activity beyond a minor traffic law violation;

b. Galveston County's policy or custom allowed GCSO deputies to misrepresent and omit material facts in a criminal investigation, and use documentation with factual mistakes, like the date of the arrest, false statements of fact, and omission of material facts to obtain criminal charges and initiate criminal prosecutions without  warrants, probable cause, or any other constitutional justification;

c. Galveston County's policy or custom of allowed GCSO deputies to violate policies related to criminal investigations and collection/reporting of evidence; and

d. Galveston County's policy or customs that allow GCSO deputies to engage in race and ethnically based policing, specifically by using subjective "observations" and other subjective criteria that could apply to almost anyone to selectively stop, search, detain, and arrest citizens based on their race or ethnicity in violation of the Fourteenth Amendment to the Constitution of the United States of American.

152. All such policies, customs, and practices were the moving force behind, and cause of, the deprivation of Tyler Harris's constitutional rights and resulting damages. Buckley's conduct as described in this Complaint was caused by said policies, customs, and practices.

153. As a direct and proximate result of Galveston County's misconduct and the violations of Tyler Harris' constitutional rights, Tyler suffered a loss of liberty when he was subjected to a wrongful traffic stop, the wrongful stop was wrongfully extended for a wrongful "investigation," he was wrongfully detained, his truck was wrongfully searched, he was wrongfully subjected to

public humiliation under the pretext of a wrongful investigation, he was wrongfully arrested, he was wrongfully jailed, his photo was wrongfully published, he was wrongfully charged and prosecuted for a crime he did not commit, and suffered and will continue to suffer emotional distress, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

**COUNT FOUR– 42 U.S.C. § 1983:**
**<u>MUNICIPAL LIABILITY</u>**
**Violation of the Fourth Amendment and Fourteenth Amendment Unconstitutional Galveston County policy and custom**

154. Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

155. Galveston County has a policy, practice, and custom of using traffic stops as a tool to conduct searches and seizures without any reason to suspect the driver of a crime. That policy, practice, and custom is executed by GCSO and its deputies.

156. The following facts, among others, show that Galveston County has an official policy, practice, and custom of using traffic stops as a tool to conduct searches and seizures without any reason to suspect the driver of a crime:

> a.  The fact that, shortly after stopping Tyler, Buckley began asking Tyler questions unrelated to the stop as part of fishing for evidence of other crimes;
>
> b. The Sheriff did not discipline Buckley or his supervisor Healy for stopping Tyler without an objective basis to conclude Tyler had committed a traffic violation or any other crime;
>
> c. The Sheriff did not discipline Buckley or his supervisor for extending the traffic stop beyond the tasks reasonably related to the only pretexts Buckley could possibly have had for making the traffic stop;
>
> d. The Sheriff did not discipline Buckley or his supervisor Healy for searching Tyler's truck without a warrant, without consent, and without probable cause to believe that the truck contained contraband or other evidence of crime;

e. The Sheriff did not discipline Buckley or his supervisor Healy for the errors, omissions and false statements in the reporting they used to seek the prosecution of Tyler; and

f. The Sheriff did not discipline Buckley or his supervisor Healy for relying on subjective "observations" to persecute Tyler that were not anchored in and were actually conflicted by objective facts;

192. Galveston County's unconstitutional policy, practice, and custom was the moving force behind the violation of Tyler's Fourth and Fourteenth Amendment right to be free from unreasonable searches and seizures and his Fourteenth Amendment right to equal protection of the law.

193. Accordingly, Tyler seeks damages, declaratory relief, and injunctive relief against Galveston County for violating his Fourth and Fourteenth Amendment right to be free from unreasonable searches and seizures and his Fourteenth Amendment right to equal protection of the law..

194 Accordingly, Tyler seeks damages, declaratory relief, and injunctive relief against

## PRAYER FOR RELIEF

195. For the violations of his Fourth and Fourteenth Amendment right to be free from unreasonable searches and seizures and his Fourteenth Amendment right to equal protection of the law, Tyler requests:

a. An award of compensatory and punitive money damages against all Defendants for the injuries Tyler suffered due to Defendants' violations of Tyler's constitutional rights as set out in this complaint;

b. An award of $1 in nominal damages based on Defendants' violations of Tyler's constitutional rights as set out in this Complaint;

c. An award of reasonable attorneys' fees and costs; and

d. Such other relief, including equitable relief, that this Court deems appropriate.

Respectfully submitted,

**/s/ Jack E. Urquhart**
**Jack E. Urquhart**
State Bar No. 20415600
Email: jack.urquhart47@gmail.com
Jack E. Urquhart Attorney at Law
1302 Waugh Drive, No. 880
Houston, TX 77019
(832) 723-2201

ATTORNEY FOR PLAINTIFF